IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ELLIOT-LEWIS CORPORATION :
: CIVIL ACTION
v. :
:
INTERNATIONAL BROTHERHOOD OF : NO. 04-2661
 ELECTRICAL WORKERS, LOCAL 98, etal

OPINION & ORDER

JACOB P. HART     DATE: June , 2011
UNITED STATES MAGISTRATE JUDGE

**BACKGROUND**

On June 17, 2004, Elliot-Lewis Corporation (hereinafter "EL") filed a Complaint in the above matter against the International Brotherhood of Electrical Workers, Local 98 (hereinafter "IBEW 98"), alleging violations of Sections 301 and 303 of the Labor Management Relations Act, 29 U.S.C. §§ 185, 187.[1] A few months later, on September 8, 2004, IBEW 98 filed a complaint against EL, alleging violations of Section 301. (Civil Action 04-4250). For settlement purposes, both suits were consolidated and referred to the undersigned.

On September 14, 2004, both cases were settled. The terms of the settlement were set forth in a Settlement Agreement, signed by counsel for EL, counsel for IBEW 98, a

---

[1] Section 301 permits suits for violations of collective bargaining agreements. These suits may be brought by an employer against a labor union, or *vice versa*. Section 303 permits suits by employers against labor unions for damages caused by certain union unfair labor practices. In this case EL claimed that IBEW 98 violated § 8(b)(4)(D) of the Labor Management Relations Act. 29 U.S.C. § 158 (b)(4)(D), by striking or threatening to strike EL, in order to force EL to select certain persons as foremen at the Philadelphia Convention Center.

representative of the Philadelphia Convention Center Authority, and the undersigned.  Thereafter, a formal Settlement Agreement and Release was signed by the parties themselves.

When the District Court in both cases issued the Rule 41.1(b) Notices of Dismissal pursuant to settlement, the Court specifically retained jurisdiction to enforce the Settlement Agreement.  In the Settlement Agreement itself, the undersigned was designated as the person responsible for resolving "any dispute arising under" the agreement:

> "In the event of any dispute arising under this Agreement, the parties agree that the matter shall be submitted for binding arbitration to Jacob P. Hart, United States Magistrate Judge.  Judge Hart's decision shall be final and not appealable." (Settlement Agreement, paragraph 8)

For almost seven years, all was quiet.  But then, on April 29, 2011, EL filed the present motion before me, seeking to enforce the settlement agreement.

## **THE PRESENT DISPUTE**

On April 22, 2011,  IBEW 98 filed a grievance against EL, claiming that EL was violating 2010-2013 Collective Bargaining Agreement between the parties by failing to pay the proper contributions to the various IBEW 98 pension and benefit funds. On April 25, 2011, the Penn-Del-Jersey Chapter of the National Electrical Contractors Association (hereinafter "NECA"), notified EL that a grievance hearing on this matter would be held before the NECA Labor Management Committee on May 5, 2011.  In order to stop this hearing from taking place, the present Motion was filed.  In its Motion, EL alleges:  (1) that the underlying dispute "arises under" the 2004 Settlement Agreement; (2) that it must be resolved by me, not the NECA Labor

Management Committee; and (3) that EL is not a party to the 2010-2013 Collective Bargaining Agreement between NECA and IBEW 98.

In response to EL's Motion, IBEW 98 argues that I have no jurisdiction to resolve the underlying contribution dispute since it does not arise under the Settlement Agreement. In the alternative, even if the dispute does arise under the Settlement Agreement, I must resolve it in favor of the Union, because EL, by its conduct, has assumed the 2010-2013 Collective Bargaining Agreement between NECA and IBEW 98.

On May 2, 2011, I ordered the parties not to proceed with the NECA Labor Management Committee grievance hearing until the present Motion was decided. We held a hearing on May 26, 2011, at which time both sides made arguments and put on live witnesses. Post hearing briefs have now been filed.

**DOES THIS DISPUTE ARISE UNDER THE SETTLEMENT AGREEMENT?**

To understand this issue, we must first understand the basic collective bargaining relationship between the parties. EL is the exclusive labor supplier at the Pennsylvania Convention Center. Because there are numerous trades necessary to provide all of the services needed by the Center, EL has collective bargaining relationships with several unions, including IBEW 98.[2]

In 2003, all of EL's unions working at the Convention Center, together with EL and the Center itself entered into a Customer Satisfaction Agreement (the CSA). The main

---

[2] In addition to IBEW 98, EL has collective bargaining relationships with Laborers International Union of North America, Local 332; International Alliance of Theatrical Stage Employees, Local 8; International Association of Bridge, Structural and Ornamental Iron Workers, Local 161; International Brotherhood of Teamsters, Local 107; and the Metropolitan Regional Council United Brotherhood of Carpenters and Joiners of America.

3

purpose of the CSA was to set forth a procedure for the allocation of work among the various union signatories, and to do so without work stoppages. Each signatory union, as well as EL, agreed that the individual collective bargaining agreements between the parties would be amended by the CSA. When EL first signed the CSA on July 16, 2003, it had not yet recognized IBEW 98 as the union for its electricians. However, on November 13, 2003, EL did recognize IBEW 98, and on February 18, 2004, both IBEW 98 and EL agreed that EL's collective bargaining agreement with IBEW 98 would include the CSA.

In addition to the CSA itself, EL and IBEW 98 have a separate collective bargaining agreement covering work at the Convention Center. This agreement is at the heart of the present dispute, and was also part of the original 2004 dispute that resulted in the two Complaints filed in this Court.

IBEW 98 has, for many years, attempted to bring all employers of electricians, including EL, under a single collective bargaining agreement negotiated between IBEW 98 and an employer association, now known as 'The Philadelphia Division of the Penn-Del-Jersey Chapter, National Electrical Contractors Association." (NECA). In order for an individual employer, such as EL, to be bound by a collective bargaining agreement negotiated on its behalf by NECA, the individual employer must sign a document called an "Individual Letter of Assent-A." The standard form of that letter of assent appears at the end of each IBEW 98 -NECA collective bargaining agreement. By signing it, an individual employer authorizes NECA to be its collective bargaining representative, and also agrees to be bound by the terms and conditions of the IBEW 98-NECA agreement then in effect, and any subsequent agreement negotiated

between IBEW 98 and NECA. The authorization for NECA to be its collective bargaining representative stays in effect until the signatory employer terminates it.

The 2004 dispute between IBEW 98 and EL involved the selection of foremen on jobs at the Convention Center. When the parties disagreed as to who these foremen should be, IBEW 98 caused a work stoppage at the Center, and, in turn, EL disciplined the employees who led the work stoppage. EL sued IBEW 98 for damages caused by the strike. IBEW 98 sued EL for refusing to comply with a grievance award ordering the strikers reinstated. In defense of the union's suit, EL claimed that the grievance procedure in the IBEW 98 - NECA agreement then in effect (2003-2006) was not binding on EL.

When the two lawsuits were settled before me in 2004, one of the most important terms was an agreed form "Letter of Assent-A." that was attached to, and made a part of, the Settlement Agreement.[3] Unlike the standard "Letter of Assent- A", the Settlement Agreement Letter of Assent did not authorize NECA to be EL's collective bargaining representative. In addition, the only IBEW 98-NECA labor agreement that EL agreed to be bound by was the "current" agreement (2003-2006).

Once it signed the Letter of Assent-A that is part of the Settlement Agreement, EL was bound by all of the terms and conditions of the 2003-2006 IBEW 98-NECA collective bargaining agreement. However, on February 17, 2006 (and as permitted by the signed Letter of Assent-A), EL notified the union that it wished to "terminate and renegotiate its existing collective bargaining agreement." (See EL Exhibit 9).

---

[3] The other major provisions in the Settlement Agreement were the waiver by EL of its damage claim against IBEW 98, the waiver by IBEW 98 of its back pay claims for the employees who were suspended over the strike, and the reduction to suspension of two employees who were fired over the strike.

The February 17, 2006 letter forms the basis for IBEW 98's argument to this Court that the present dispute does not arise under the Settlement Agreement. EL contends that the Letter of Assent -A attached to the Settlement Agreement is still in effect, and, therefore, the fund contribution dispute does "arise" under the Settlement Agreement. IBEW 98, however, contends that EL's February 17, 2006 letter terminated not only the 2003-2006 collective bargaining agreement, but also terminated the underlying Letter of Assent-A. IBEW 98 points to the provision in the signed Letter of Assent-A that says, in relevant part" "This authorization shall remain in effect....until terminated by the Company upon written notice to the Local Union at least sixty (60) days prior to the then current anniversary date of the applicable approved labor agreement."

The Court does not agree with IBEW 98's position on this issue. In order to figure out what is meant by the word "authorization," in the signed version of the Letter of Assent-A, one must first look at the standard Letter of Assent-A. There, the term clearly refers to the "authorization" of NECA to be the signatory employer's collective bargaining representative. The standard letter of assent, in its very first sentence, states that the signatory employer "does hereby <u>authorize</u>....NECA as its collective bargaining representative...." (Emphasis added). Therefore, it is clear that when the "authorization" is terminated, all that is being terminated is NECA's authority to be the employer's collective bargaining representative.[4] Since EL's signed letter of assent never makes NECA its collective bargaining representative in the first place, leaving the word "authorization" in the signed letter of assent is just an example of sloppy

---

[4]This is obviously true, since the standard letter of assent continues in effect for future labor agreements, as well as the present labor agreement.

drafting. It would have been clearer had it said "this collective bargaining agreement shall remain in effect," but that is obviously what the parties meant. Quite simply, it couldn't mean anything else.

Since the Court concludes that the signed Letter of Assent-A is still in effect, the present dispute does arise under the Settlement Agreement.

## **WHAT LABOR AGREEMENT, IF ANY, IS CURRENTLY IN EFFECT?**

The labor agreement in effect when the Settlement Agreement was signed on September 14, 2004 was the IBEW 98-NECA agreement covering the period April 28, 2003 to April 20, 2006. Although the labor agreement itself provided that a party wishing to terminate it had to give the other side at least 90 days advanced notice, the IBEW 98-EL signed Letter of Assent-A only required 60 days advanced notice.

On February 17, 2006, 62 days before April 20, 1996, EL notified IBEW 98, in writing, that it "wishes to terminate and renegotiate its existing collective bargaining agreement with the Union." (EL Exhibit 9). Thereafter, counsel for EL wrote several follow-up letters to the union, trying to schedule negotiations (EL Exhibits 10-12). Although no new collective bargaining agreement was ever signed, both sides agree that an oral deal was made, under which EL agreed to the terms of the May 1, 2006 to April 20, 2010 IBEW 98-NECA agreement.[5] (See testimony of EL witness, James Gentile, Vice President of Facilities Management, at pages 46-51; and testimony of IBEW 98 witness, John J. Dougherty, Business Manager of IBEW 98, at

---

[5] The only provisions in the 2006-2010 agreement that were different from the 2003-2006 agreement were the wage rates and fringe benefit rates (EL Exhibit 14).

7

page 72). This oral agreement did not result in a new Letter of Assent-A being signed. In fact, the Letter of Assent-A that is part of the Settlement Agreement is the only letter of assent that EL has ever signed with IBEW 98. (Dougherty testimony at page 80).

EL complied with all the provisions of the 2006-2010 agreement during its four year term. However, on January 19, 2010, EL notified IBEW 98 that "it wishes to terminate and renegotiate its existing collective bargain agreement with the Union." (EL Exhibit 15)

In the meantime, IBEW 98 and NECA negotiated a new collective bargaining agreement, covering the period May 3, 2010 to April 20, 2013. Like its predecessor agreement, this new contract changed only wage rates and fringe benefit rates. In fact, the journeyman's base rate of $46.85 per hour did not change at all during the first year of the new contract. Only the fringe benefit rates changed in the first year.

Once again, EL and IBEW 98 never signed a new collective bargaining agreement. However, unlike the oral agreement reached in 2006, no agreement – oral or written - was ever reached in 2010. Nevertheless, IBEW 98 argues that EL is still bound by the 2010-2013 IBEW 98-NECA agreement because EL is complying with all of the non-monetary terms of that agreement, and with some of the financial terms as well. EL, however, claims that it is not complying with ANY of the terms of the new agreement. The non-monetary terms are identical to those in the 2006-2010 agreement, and EL claims that all of the wage rates and contribution rates it is paying are from the last year of the 2006-2010 agreement. In short, because it never reached a new deal with IBEW 98, EL is simply complying with the 2006-2010 agreement that it wished to terminate and renegotiate on January 19, 2010.

This is the fundamental point where the parties disagree. IBEW 98 believes that EL is bound by the 2010-2013 NECA agreement, because EL has been conducting itself in accordance with that agreement – except for certain fringe benefit contributions.[6] EL, however, takes the position that there is NO collective bargaining agreement currently in effect between the parties. EL believes it terminated the 2006-2010 agreement, has not yet made a deal with IBEW 98 for a new agreement, and is continuing to pay wages and make fringe benefit contributions under the now expired agreement, because it is required to do so by the National Labor Relations Act until either a new collective bargaining agreement has been negotiated or a bargaining impasse has been reached.

We start first with IBEW 98's position that EL is bound by the 2010-2013 NECA collective bargaining agreement. This argument is based on the union's factual assertion that EL is complying with many provisions of the new agreement, including the grievance procedure and the fund contribution rates for maintenance electricians. The law is clear that an employer may be held bound to an entire collective bargaining agreement by complying with parts of it, even though it never signed the agreement. E.S.P. Concrete Pumping, Inc., 327 NLRB 711. 713(1999); DST Insulation, Inc., 351 NLRB 19, 20 (2007).

Unfortunately, the evidence simply does not support the union's factual assertion. Although the union's Exhibits E, F & G, do show that EL has used a contractual grievance procedure during the term of the present IBEW 98 - NECA collective bargaining agreement, the particular grievance procedure used is not the one contained in the NECA agreement. All of the

---

[6] EL's failure to pay the 2010 fringe benefit contribution rates is the reason for the present grievance.

grievances cited by the union were filed under the Customer Satisfaction Agreement, the CSA (see page 4, *supra*). There is no dispute that the CSA is binding on both parties, and has been in effect since 2003. The union has offered no proof that EL has allowed any grievance to be processed under the current NECA agreement. In fact, this very proceeding is an attempt by EL to avoid having to adhere to the NECA grievance system.

The union's claim that EL is making fund contributions for maintenance electricians under the 2010-2013 rates is also incorrect. The union's own CPA, Novak/Francella, audited EL's maintenance electrician fund contributions for the period January 1, 2008 through December 31, 2010, and concluded that the contributions were too low from May 2010 through December 2010, precisely because EL was continuing to use the May 1, 2009 rate instead of the May 1, 2010 rate. (See EL Exhibit 24). EL's Payroll Manager, Karen Clifford, also testified that EL was using the 2009 rate for all electricians, both show and maintenance.[7] In fact, IBEW 98's own Business Manager, Mr. Dougherty, admitted that EL was making fund contributions using the old contract rate. He did not limit those old rate contributions to show electricians. (N.T. 86). Since both sides agree that the contract language (except for the fund contributions) in the first year of the present NECA agreement is identical with the contract language in the old agreement, EL's compliance with those terms does not show that it has adopted the present NECA contract. The Court concludes, therefore, that EL is not bound by 2010-2013 IBEW 98-NECA agreement.

---

[7] The contribution reports look somewhat confusing because the percentage contribution rates for the various funds are higher for maintenance electricians than show (journeymen) electricians. But that is because the actual wage rate for the maintenance electricians is only 90% of the rate for the show electricians, but the fund contributions must be the same for both jobs in dollars and cents. To make this calculation, both the fund accountant and the EL payroll manager have to raise the contribution percentage for the maintenance electricians. (Compare EL Exhibits 23 and 24)

We turn next to EL's position that it is not bound today by any collective bargaining agreement with IBEW 98. Since both sides agree that the 2003-2006 NECA agreement no longer applies, and since the Court has found that EL is not bound by the 2010-2013 agreement, the only one left is the 2006-2010 agreement.

Although both sides served notice on the other in 2010 of their desire to terminate the agreement, the Court was concerned by the fact that EL did not actually cause the termination to occur. Section 1.02(d) of the 2006-2010 NECA agreement provides that if no new agreement is reached by the current agreement's expiration date, in order for that agreement to actually terminate one side or the other must serve a written 10 day termination notice. Because EL did not serve such a 10 day notice, it appeared to the Court that the 2006-2010 agreement is still in effect. However, in its post hearing brief, EL has informed the Court that while EL did not terminate the 2006-2010 agreement, IBEW 98 did! Attached to EL's post hearing brief is a copy of an April 20,2010 letter from John Dougherty to EL, terminating the contract on 10 days notice. Therefore, on April 30, 2010, the 2006-2010 agreement between IBEW 98 and EL terminated. As a result, there is no collective bargaining agreement currently in effect between EL and IBEW 98.

## **WHAT IS THE RESULT OF HAVING NO CBA IN EFFECT?**

IBEW 98 argues that EL cannot have it both ways. If it is paying wages and fringe benefits under the 2006-2010 CBA, whether bound by it or not, EL must follow the grievance procedure as well, and submit the current fund rate dispute to the NECA Labor Management Committee. Putting aside for the moment that, in order to sustain that grievance, the Committee would have to overrule this Court's decision that EL is not bound by the 2010-

11

2013 NECA agreement, it is the opinion of this Court that EL CAN have it both ways. In fact, EL is required by law to continue paying wages and benefits under the old contract, but it is not required to comply with the grievance procedure of that contract, any more than IBEW 98 is required to comply with the no-strike provision.

IBEW 98 correctly points out that under Section 302(c)(5)(B) of the National Labor Relations Act, 29 U.S.C. § 186(c)(5)(B), no money may be paid by an employer to a trust fund established by a union, unless "the detailed basis on which such payments are to be made is specified in a written agreement...." However, the Act does not require that the written agreement must be in effect at the time the payment is made. It requires only that such an agreement exists. Section 302 (c) is actually a list of exceptions to the basic restrictions of Section 302 (a), 29 U.S.C. § 186 (a). Section (a) makes it a criminal act for an employer to pay money to a union. The act was designed to prevent employers from paying kickbacks to unions, and to prevent unions from trying to shake down employers. The exception section exists because Congress recognized that sometimes an employer must pay money to a union (e.g. dues checkoffs) or to a union fund (e.g. pension, health & welfare funds), as part of the employer's collective bargaining relationship with the union. Therefore, it would be absurd to read the Act as prohibiting an employer from continuing to make payments to union funds under an existing collective bargaining agreement that has expired, while the parties are attempting to negotiate a new agreement.

In fact, the United States Supreme Court, as well as the NLRB, has held that an employer commits the unfair labor practice of failing to bargain collectively, in violation of Section 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5), if it unilaterally

changes the terms of an expired collective bargaining agreement before bargaining impasse has been reached. National Labor Relations Board v. Katz, 369 U.S. 736, 743 (1962); Laborers Health and Welfare Trust Fund for Northern California v. Advanced Lightweight Concrete Co., 484 U.S. 539, 544, n.6; Hacienda Hotel, Inc. Gaming Corp., 355 NLRB No. 154 (2010). It would be a strange Act, indeed, that required an employer to violate one section, 302(a), in order to avoid violating another section, 8 (a)(5).

But what about the grievance procedure? If an employer commits an unfair labor practice by not paying the fund contribution rates of an expired collective bargaining agreement before impasse has been reached, how can it ignore the grievance procedure of an expired collective bargaining agreement before impasse has been reached? The simple answer is that the unilateral-change doctrine, announced first in Katz, does not apply to every provision of an expired collective bargaining agreement. If it did, then a union could not go on strike after the expiration of a collective bargaining agreement containing a no strike clause, until bargaining impasse was reached. Unions are subject to the same duty to bargain collectively as are employers, and a failure of a union to do so is also an unfair labor practice. Compare Section 8(a)(5) of the National Labor Relations Act with Section 8(b)(3). Yet, we all know that unions are permitted to strike one second after a collective bargaining agreement expires, impasse or not. See National Labor Relations Board v. Insurance Agents' International Union. AFL-CIO, 361 U.S. 477, 491 (1960), cited with approval in Katz. That is because a no strike clause does not survive the expiration of a collective bargaining agreement.[8]

---

[8] Indeed, IBEW 98's own April 20, 2010, contract termination letter states: "As a result of this termination, the no-strike provision of Section 1.04 will no longer be in effect. Please be guided accordingly."

The same is true for a mandatory grievance procedure clause. See Hacienda at page 6. This makes perfect sense since a no strike clause and a mandatory grievance procedure clause are intertwined. In exchange for the employer agreeing to resolve disputes through arbitration, the union agrees not to resolve them by striking.

For all the foregoing reasons, it is the opinion of this Court that EL is not required to participate in any NECA Labor Management Committee hearing pursuant to the IBEW 98-NECA collective bargaining agreement. In addition, IBEW 98 is not bound by the no-strike provision of that agreement, as it relates to EL. It may engage in any otherwise lawful work stoppage.

An appropriate ORDER follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ELLIOT-LEWIS CORPORATION | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | |
| INTERNATIONAL BROTHERHOOD OF | : | NO. 04-2661 |
| ELECTRICAL WORKERS, LOCAL 98, | : | |
| et al | | |

**ORDER**

AND NOW, this 17th day of June, 2011, IT IS HEREBY ORDERED that Plaintiff's Motion to Enforce Settlement Agreement (Docket No.36) is GRANTED.

Plaintiff Elliot-Lewis Corporation is not bound by the grievance procedure of the 2010-2013 collective bargaining agreement between IBEW 98 and NECA, and is, therefore, not required to participate in any NECA Labor Management Committee hearing pursuant to that collective bargaining agreement.

In addition, IBEW 98 is not bound by the no-strike provision of that agreement, as it relates to EL. It may engage in any otherwise lawful work stoppage.

BY THE COURT:

/s/ Jacob P. Hart
_____
JACOB P. HART
UNITED STATES MAGISTRATE JUDGE